**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

**INNOVATIVE PRODUCT MANUFACTURING, LLC,**

Plaintiff,

v.

**SIEMENS HEALTHINEERS AG and SIEMENS HEALTHCARE GMBH,**

Defendants.

Civil Action No. 2:26-ocv-888

**JURY TRIAL DEMANDED**

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Innovative Product Manufacturing, LLC ("IPM"), files this Complaint for patent infringement against Defendants Siemens Healthineers AG ("Siemens Healthineers") and Siemens Healthcare GmbH ("Siemens Healthcare") (collectively, "Defendants"), and in support thereof alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*., including, specifically 35 U.S.C. § 271, based on infringement of U.S. Patent Nos. 7,965,290 (the "'290 Patent"), 9,159,170 (the "'170 Patent"), and 9,342,913 (the "'913 Patent") (collectively, the "Patents-in-Suit").

2. The Patents-in-Suit arose from efforts by NGRAIN (Canada) Corporation ("NGRAIN") to solve practical challenges associated with loading, processing, rendering, and manipulating complex two- and three-dimensional data. NGRAIN developed commercial three-dimensional visualization technology for demanding applications in which users needed to interact with detailed digital representations of physical objects and their component parts.

3. Unlike conventional surface-based graphics, voxel-based graphics represent an object as volumetric data. This approach allows software to represent and process information throughout a three-dimensional object, rather than depicting only its exterior surface. Volumetric datasets, however, can be large and computationally demanding, creating challenges in efficiently loading, processing, and displaying complex three-dimensional objects.

4. NGRAIN's engineers developed and patented technological solutions to those challenges. The '290 Patent concerns progressively loading and processing data in a multilevel locking-free structure; the '170 Patent concerns optimizations in rendering 3D datasets based on

excluding certain parts; and the ’913 Patent concerns manipulating discrete portions of an animation of a 3D object.

5. This lawsuit is for infringement of the inventions claimed in the Patents-in-Suit.

## THE PARTIES

6. IPM is a limited liability company organized and existing under the laws of Pennsylvania, with its principal place of business at 4024 Cross Creek Circle, Valencia, PA 16059.

7. IPM is the owner by assignment of all right, title, and interest in and to the Patents-in-Suit.

8. On information and belief, Siemens Healthineers AG is a stock corporation (Aktiengesellschaft) organized and existing under the laws of Germany, with its registered office in Munich, Germany and its principal place of business at either Siemensstrasse 3, 91301 Forchheim, Germany or Henkestrasse 127, 91052 Erlangen, Germany.

9. On information and belief, Siemens Healthcare GmbH is a limited-liability company (Gesellschaft mit beschränkter Haftung) organized and existing under the laws of Germany, with its principal place of business at Henkestrasse 127, 91052 Erlangen, Germany. Siemens Healthcare GmbH is a fully owned subsidiary of Siemens Healthineers AG.[1]

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction over IPM’s patent infringement claims under 28 U.S.C. §§ 1331 and 1338(a) because the action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq*., including 35 U.S.C. § 271.

---

[1] *See* Siemens Healthineers AG, *Annual Report 2025*, at 190 (Dec. 2, 2025), available at https://corporate.webassets.siemens-healthineers.com/a364b935102e7df5/d7fdacda458e/siemens-healthineers-ir-annual-report-2025.pdf; *see also* Corporate Disclosure Statement of Siemens Healthineers AG, *Innovere Medical Inc. v. Siemens Healthineers AG*, No. 2:25-cv-01147-JRG, Dkt. 15 (E.D. Tex. Oct. 1, 2026).

11. This Court has personal jurisdiction over Defendants because, on information and belief, Defendants, acting in concert with one another and with their U.S. affiliate and wholly owned subsidiary Siemens Medical Solutions USA, Inc., have purposefully directed conduct concerning the Accused Instrumentalities (defined below) towards Texas and this District and purposefully placed or directed the Accused Instrumentalities into the stream of commerce through an established distribution channel, such that Defendants knew, or reasonably could have foreseen, that Texas and this District would be a termination point of that channel.

12. Defendants' Texas-directed conduct includes, among other things, the development, importation, licensing, marketing, offering, sale, supplying, installation, use, service, and support of the Accused Instrumentalities, and the making of FDA regulatory filings related to the Accused Instrumentalities, for Texas customers and end users.

13. On information and belief, Defendants act directly and/or through subsidiaries, affiliates, and agents, including Siemens Medical Solutions USA, Inc. and Varian Medical Systems, Inc. to design, manufacture, use, market, offer for sale, sell, import, and support the Accused Instrumentalities in the United States. Defendants have repeatedly submitted filings to the FDA for clearance of the Accused Instrumentalities in the United States, either directly or, on information and belief, by directing those U.S.-based affiliates to submit such filings on their behalf. In at least some FDA 510(k) applications seeking clearance to offer the Accused Instrumentalities for sale in the United States, Siemens Healthcare is listed as the manufacturer of the Accused Instrumentalities. These FDA clearances were a necessary predicate for, and directly preceded, the importation, offering for sale, and sale of the Accused Instrumentalities into the United States and, more specifically, Texas and this District, as described below.

14. As a result of clearance, importation, offering for sale, and sale of the Accused Instrumentalities into the United States and, more specifically, Texas and this District, on information and belief, the Accused Instrumentalities are currently used in at least the following hospitals and medical services locations in Texas and this District: UT Southwestern Medical Center in Dallas, Texas,[2] Sammons Brainhealth Imaging Center at the University of Texas at Dallas[3], the University of Texas MD Anderson Cancer Center[4], Houston Methodist Willowbrook Hospital,[5] and UT Health East Texas in Tyler, Texas.[6] For example, a CBS19 news segment on UT Health East Texas's expanded facility in Tyler, Texas depicts a Siemens Healthineers SOMATOM Pro.Pulse system installed at that facility, as shown below. On information and belief, that system operates with, and/or is used in conjunction with the Accused Instrumentalities (including but not limited to *syngo*-based software) at that facility.[7]

[2] *See* Areej Aljabal et al., *Image Quality and Radiation Dose Comparison for Abdominopelvic CT Studies Performed Using Photon-Counting CT and Dual-Energy CT: A Clinical Study*, 8 BJR Open tzag012 (2026), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC13259597/.

[3] *See* Sammons BrainHealth Imaging Center, available at https://bhic.utdallas.edu/equipment/.

[4] *See* Christopher M. Walker et al., *Initial Experience with Remote MRI Scanning Support in an Oncology Focused Practice: Opportunities for Expanded Access to Radiology Care,* J. Applied Clinical Medical Physics, available at https://doi.org/10.1002/acm2.70461.

[5] *See* Mary C. Tierney, Lessons from Methodist: Deploying Evidence-Based Reporting, Cardiovascular Business, available at https://cardiovascularbusiness.com/sponsored/1165/siemens-healthineers/topics/patient-care/lessons-methodist-deploying-evidence-based-reporting.

[6] *See UT Health East Texas Opens Expanded Tyler Facility with Advanced Technology*, CBS19 (Aug. 27, 2026), available at https://www.cbs19.tv/video/news/local/ut-health-east-texas-opens-tyler-facility-with-technology/501-c17c04c0-7835-449b-bd99-47434297b421.

[7] *Id.*




UT Health East Texas unveiled its expanded Tyler facility, bringing specialty care, imaging and women's health services together under one roof.

15. To the extent that Defendants did not directly make, use, sell, offer for sale, or import into the United States and into Texas (including at the locations identified above) the Accused Instrumentalities, then, on information and belief, Defendants acted in concert with their U.S.-based affiliates and subsidiaries, including Siemens Medical Solutions USA, Inc., and other distribution agents to place the Accused Instrumentalities into the stream of commerce to reach Texas users and customers, including users and customers in this District.

16. Defendants have further prepared the Accused Instrumentalities for use and sale in the United States, including in Texas, by creating English-language user manuals, training materials, and marketing materials for the Accused Instrumentalities.

17. On information and belief, Defendants further direct U.S.-based support to customers in the United States and in Texas. For example, a recent post on Defendants' careers website advertised an on-site "Syngo Service Manager (Digital & Automation)" in Houston, Texas, whose stated responsibilities include serving as the on-site operational owner and first-line support lead for *syngo*.via and related imaging applications, supporting *syngo*.via users,

monitoring system health and data flows, performing application-level administration, and coordinating with Siemens Healthineers support organizations.[8]

18. The exercise of jurisdiction over Defendants is consistent with due process because IPM's claims arise from or relate to Defendants' United States- and Texas-directed conduct concerning the Accused Instrumentalities, and Defendants reasonably could anticipate being called to answer in a Texas court (including in this District) for infringement arising from that conduct.

19. The exercise of jurisdiction over Defendants is also reasonable and fair. Any burden on Defendants in litigating in this District is minimal in light of modern means of communication and transportation. Texas and the United States have a substantial interest in enforcing federal patent laws and in discouraging patent infringement occurring within their borders, including infringement arising from the use of the Accused Instrumentalities at the Texas hospitals and medical facilities identified above. IPM has a strong interest in obtaining relief in a single forum for infringement occurring throughout the United States, including Texas. The judicial system's interest in the efficient resolution of controversies, and the interest in protecting patent rights, likewise favor the exercise of jurisdiction in this Court.

20. In the alternative, this Court has personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

21. IPM's claims arise under federal law, and specifically the Patent Act, Title 35 of the U.S. Code.

22. On information and belief, Defendants are foreign entities not subject to jurisdiction in any state's courts of general jurisdiction.

---

[8] *See* Syngo Service Manager (Digital & Automation) - Houston, TX, Siemens Healthineers Careers, available at https://careers.siemens-healthineers.com/global/en/job/R-30125/Syngo-Service-Manager-Digital-Automation-Houston-TX.

23. The contacts toward Texas detailed above are additionally relevant as contacts toward the United States as a whole for purposes of personal jurisdiction under Rule 4(k)(2), and such contacts support personal jurisdiction over the Defendants.

24. Venue is proper in this District under 28 U.S.C. § 1391(c)(3) because Defendants are foreign entities that do not reside in the United States and may be sued in any judicial district.

## THE ACCUSED INSTRUMENTALITIES

25. Defendants develop, license, market, offer, supply, and support *syngo*.via for customers and end users in the United States, including in Texas (and this District), directly and through its affiliates, distributors, and other entities acting on its behalf.

26. Defendants' publicly available materials describe *syngo*.via as a medical-imaging platform used for viewing, manipulating, communicating, and storing two- and three-dimensional medical images for analysis and diagnosis.

27. The *syngo* medical-imaging platform, whether operating as a stand-alone product (including *syngo*.via alone or in combination with *syngo*.via-based software options such as *syngo*.CT and *syngo.*MR) or together with the medical imaging devices, applications, workflows, modules, subsystems, servers, clients, and computer systems that perform the specifically alleged functionality, and all such versions of the *syngo* medical-imaging platform that perform such functionality, as well as all related and similar software, imaging platforms, and products made, sold, offered for sale, or imported into the U.S. by or for Defendants are referred to herein as the "Accused Instrumentalities." For the avoidance of doubt, the Accused Instrumentalities include Defendants' medical-imaging software, workstations, platforms, devices, and products other than *syngo*.via, including but not limited to other *syngo*-branded and *syngo*-based products, which incorporate, implement, provide access to, or perform the same or materially similar functionality,

whether independently or through interoperability or integration with *syngo*.via or other of Defendants' medical imaging systems and platforms.

28. *syngo*.via uses Open Inventor, a commercial three-dimensional graphics software-development toolkit, as the "basis for all 3D-rendering performed in *syngo*.via."[9] Open Inventor's publicly available technical documentation describes functionality for, among other things, hierarchical volume-data management, asynchronous and progressive loading, selective volume rendering, object selection, graphical manipulation, and animation.

29. On information and belief, at least certain versions and configurations of the Accused Instrumentalities implement and execute Open Inventor components and functionality to load, process, render, select, manipulate, and display two- and three-dimensional medical-image data in a way that, in combination with other functionality of the Accused Instrumentalities, infringes the Patents-in-Suit.

30. On information and belief, Defendants have collaborated with third parties, including at least Thermo Fisher Scientific, to contribute to the development and use of Open Inventor, at least as it is utilized in the Accused Instrumentalities.

## **KNOWLEDGE OF THE PATENTS-IN-SUIT**

31. Siemens Healthcare and ultimately Siemens Healthineers have knowledge of the '290 Patent at least because, during prosecution of U.S. Patent Application No. 13/552,827 ("the Siemens '827 Application") filed by predecessor in interest Siemens Aktiengesellschaft ("Siemens AG"), and on August 26, 2014, the USPTO Examiner identified the '290 Patent as relevant to the

---

[9] *See syngo.via Imaging Software for Advanced Visualization by Siemens Healthineers,* Open Inventor (archived June 23, 2025), available at https://web.archive.org/web/20250623093519/https:/www.openinventor.com/en/about/user-testimonials/detail/syngo-via-imaging-software-for-advanced-visualization-by-siemens-healthineers.

Siemens ’827 Application. Accordingly, on information and belief, the ’290 Patent was received and reviewed on behalf of the Siemens’ medical technology business, which includes the Accused Instrumentalities product line, and which now sits with Defendants.

32. At a minimum, at least as of the date of this Complaint, Defendants have knowledge of each of the Patents-in-Suit, as well as their infringement thereof.

**COUNT I**
**(Infringement of the ’290 Patent)**

33. IPM incorporates by reference each allegation in the Paragraphs above as if fully set forth herein.

34. The ’290 Patent, entitled “Method, System, and Data Structure for Progressive Loading and Processing of a 3D Dataset,” duly and legally issued on June 21, 2011, from U.S. Patent Application No. 11/777,991, filed July 13, 2007. The ’290 Patent names Vladimir Kouznetsov, Lev N. Gretskii, and Filip Petrovic as inventors.

35. IPM owns all substantial rights, interests, and title in and to the ’290 Patent, including the sole and exclusive right to prosecute this action, enforce the ’290 Patent against infringers, and collect damages for all relevant times.

36. The ’290 Patent generally relates to methods for progressively loading and processing data using a multilevel, locking-free structure. The claimed structure includes multiple levels of data in which loaded data segments become available for further processing when references to those segments are established at a higher level of the structure. Loading and processing repeat so that progressively more data segments become available for further processing.

37. The technology disclosed in the ’290 Patent addresses problems that can arise when one computing process loads three-dimensional data while another process renders or otherwise

processes that data. Without an appropriate data structure, the loading and processing threads may wait on one another, creating a risk of deadlock that can halt the operation.

38. The '290 Patent describes a technological solution to that problem that uses references to make completed portions of the data available for processing while additional data continues to load. This structure permits a processing thread to operate on completed data segments without attempting to process incomplete data and without requiring the loading and processing threads to wait on locks.

39. The '290 Patent is directed to patent-eligible subject matter pursuant to 35 U.S.C. § 101.

40. The '290 Patent is valid and enforceable, and presumed as such, pursuant to 35 U.S.C. § 282.

41. Defendants have infringed and continue to infringe the '290 Patent, including by (a) making the Accused Instrumentalities in the United States; (b) using the Accused Instrumentalities in the United States, including by demonstrating them at industry conferences such as the annual meeting of the Radiological Society of North America ("RSNA") in Chicago, Illinois, where Siemens introduced *syngo*.via VA30A in 2013 and the *syngo*.via VB20 software upgrade in 2016,[10] and by testing, installing, validating, and servicing them; (c) selling and offering to sell the Accused Instrumentalities for delivery, installation, and use in the United States, including through license and supply arrangements under which Defendants supply each version

[10] *See* Siemens Healthineers, Background Information: How Cinematic Volume Rendering Technique Brings a New View to Clinical Imaging (Nov. 27, 2016), available at https://cdn0.scrvt.com/0e46935d037de4ec3888566275864b37/1800000004387540/84828dc92b67/background-cinematic-rendering-e_1800000004387540.pdf.

of software and updates and upgrades for U.S. customers; and (d) importing, or causing to be imported, the Accused Instrumentalities into the United States.[11]

42. Defendants have induced and continue to induce infringement of the ’290 Patent by encouraging, instructing, supporting, and assisting its affiliates, customers, and end users, with knowledge that such use infringes, to make, use, sell, offer to sell, and import the Accused Instrumentalities in the United States in a manner that directly infringes the ’290 Patent.

43. Defendants have and continue to contribute to the direct infringement of the ’290 Patent by its affiliates, customers, and end users when such affiliates, customers, and end users use, for example, *syngo*.via in combination with, for example, medical diagnostic equipment and other Accused Instrumentalities. Defendants do so with knowledge that, for example, *syngo*.via is especially made for use in an infringing manner.

44. The Accused Instrumentalities meet each and every requirement of at least method claim 1 of the ’290 Patent.

45. For example, *syngo*.via, including by way of its implementation of Open Inventor’s LDM architecture, progressively loads and processes two- and three-dimensional data using a multilevel, tile-based octree hierarchy in which each tile becomes available for processing only when a reference to that tile is published into the level above it, without requiring the rendering/processing thread to acquire a lock on the data structure, because the render/processing thread treats an unreferenced tile as unavailable regardless of whether loading of that tile has already begun. *syngo*.via also includes a configurable load-notification rate and minimum-tiles-

[11] *See* Siemens Healthcare, *RSNA 2013: New Version of syngo.via Brings Anatomical Intelligence” to Diagnostic Reading* (Nov. 26, 2013), HealthManagement.org, available at https://healthmanagement.org/c/imaging/news/new/rsna-2013-new-version-of-syngo-via-brings-anatomical-intelligence-to-diagnostic-reading.

to-load setting that drives repeated loading of additional tiles and repeated reference-setting as each tile completes, so that progressively more data segments become available for processing over time without interrupting the render/processing thread.

46. *syngo*.via further exhibits behavior consistent with the same or a similar mechanism, including (a) its LRQ and TC image-quality indicators, which reflect that individual images display before their loading, transfer, or rendering is complete and are updated once each image becomes fully available, and (b) a staged, progressively-populated hierarchy of studies, acquisition bundles, and series/reconstructions. On information and belief, these behaviors implement the same or similar reference-gated, multilevel mechanism as the module discussed above which incorporates and utilizes Open Inventor LDM . Regardless, *syngo*.via adds clinical workflow and data-management functionality, which organizes a patient's multiple acquisitions and reconstructions into a clinically meaningful hierarchy independent of how any individual acquisition is tiled and rendered. *syngo*.via's staged, multi-step clinical workflows (including Data Selection, Registration, Segmentation, and Results in the Auto Lung 3D tool, as a nonlimiting example) are further constructed such that each step is enabled only once a prior step's background computation completes.

47. IPM has been harmed as a result of the infringing conduct alleged above. Defendants are liable to IPM for damages adequate to compensate for Defendants' infringement, which by law cannot be less than a reasonable royalty, together with interests and costs as fixed by this Court under 35 U.S.C. § 284.

48. Defendants' infringement of the '290 Patent, at least as of the date of the Complaint, is willful, intentional, deliberate, and/or in conscious disregard of IPM's rights under the '290 Patent.

49. The patent-marking provisions of 35 U.S.C. § 287(a) do not limit IPM's recovery for the infringement alleged in this Count either because they are not applicable or, in the alternative, because IPM has complied with the marking statute.

**COUNT II**
**(Infringement of the '170 Patent)**

50. IPM incorporates by reference each allegation in the Paragraphs above as if fully set forth herein.

51. The '170 Patent, entitled "System and Method for Optimal Geometry Configuration Based on Parts Exclusion," duly and legally issued on October 13, 2015, from U.S. Patent Application No. 13/777,916, filed February 26, 2013. The '170 Patent names Chun Yue Gordon Wong, Jacqueline Li, Jeffrey York Brace, and Graham Thurstan Smith as inventors.

52. IPM owns all substantial rights, interests, and title in and to the '170 Patent, including the sole and exclusive right to prosecute this action, enforce the '170 Patent against infringers, and collect damages for all relevant times.

53. The '170 Patent generally relates to methods for more efficient building, configuring, loading, and rendering three-dimensional graphics data for an object composed of multiple parts. The three-dimensional graphics data include a geometry dataset and configuration file identifying whether the object's individual parts are used or unused in multiple display features.

54. The '170 Patent addresses the unnecessary use of computing resources that occurs when a system loads geometry for parts of an object that are not used in any relevant display feature. Loading geometry that will not be used consumes memory and processing resources and may slow the loading and rendering of the object.

55. The ’170 Patent describes a technological solution in which the system determines which parts are unused in each of multiple display features and identifies as excluded parts those parts that are unused in all of the display features. The system saves a list of those excluded parts in association with the object. When the object is rendered, the disclosed system uses the excluded parts list to load three-dimensional geometry for the non-excluded parts while not loading geometry for the excluded parts.

56. The ’170 Patent is directed to patent-eligible subject matter pursuant to 35 U.S.C. § 101.

57. The ’170 Patent is valid and enforceable, and presumed as such, pursuant to 35 U.S.C. § 282.

58. Defendants have infringed and continue to infringe the ’170 Patent, including by (a) making the Accused Instrumentalities in the United States; (b) using the Accused Instrumentalities in the United States, including by demonstrating them at industry conferences such as the annual meeting of the Radiological Society of North America (“RSNA”) in Chicago, Illinois, where Siemens introduced the *syngo*.via VB20 software upgrade in 2016,[12] and by testing, installing, validating, and servicing them; (c) selling and offering to sell the Accused Instrumentalities for delivery, installation, and use in the United States, including through license and supply arrangements under which Defendants supply each version of software and updates

---

[12] *See* Siemens Healthineers, Background Information: How Cinematic Volume Rendering Technique Brings a New View to Clinical Imaging (Nov. 27, 2016), available at https://cdn0.scrvt.com/0e46935d037de4ec3888566275864b37/1800000004387540/84828dc92b67/background-cinematic-rendering-e_1800000004387540.pdf.

and upgrades for U.S. customers; and (d) importing, or causing to be imported, the Accused Instrumentalities into the United States.[13]

59. Defendants have induced and continue to induce infringement of the ’170 Patent by encouraging, instructing, supporting, and assisting its affiliates, customers, and end users, with knowledge that such use infringes, to make, use, sell, offer to sell, and import the Accused Instrumentalities in the United States in a manner that directly infringes the ’170 Patent.

60. Defendants have and continue to contribute to the direct infringement of the ’170 Patent by its affiliates, customers, and end users when such affiliates, customers, and end users use, for example, *syngo*.via in combination with, for example, medical diagnostic equipment and other Accused Instrumentalities. Defendants do so with knowledge that, for example, *syngo*.via is especially made for use in an infringing manner.

61. The Accused Instrumentalities meet each and every requirement of at least method claim 9 of the ’170 Patent.

62. For example, *syngo*.via includes Anatomy Visualizer, Exclude Lobes, Cardiac Masking, bone removal, and related masking and segmentation functionality that loads 3D graphics for a patient’s anatomy as an object consisting of multiple parts or anatomical structures that are individually selectable and displayable and tracks for each such part, individually managed segmentation-object properties, together with masking tools whose exclusion decisions are applied consistently across multiple distinct display contexts, such that a mask applied in one view is automatically applied across other views. As another non-limiting example, the Exclude Lobes

[13] *See* Siemens Healthcare, *RSNA 2013: New Version of syngo.via Brings Anatomical Intelligence” to Diagnostic Reading* (Nov. 26, 2013), HealthManagement.org, available at https://healthmanagement.org/c/imaging/news/new/rsna-2013-new-version-of-syngo-via-brings-anatomical-intelligence-to-diagnostic-reading.

tool allows a user to determine that specific parts (for example, lung lobes) are unused in the segmentation and quantification display features, by selecting those lobes from a list. Bone removal, Structure Isolation, and Edit Bone Removal tools likewise determine, and allow revision of, which structures are masked out or displayed. Defendants' own documentation characterizes these tools, such as Clip Box, Clip Plane, and Bone Removal Auto, as "Optimization tools," consistent with the purpose of excluding unused geometry from the rendering and processing pipeline. These determinations are saved and have a persistent effect on later processing and display in the image area and in a results table.

63. IPM has been harmed as a result of the infringing conduct alleged above. Defendants are liable to IPM for damages adequate to compensate for Defendants' infringement, which by law cannot be less than a reasonable royalty, together with interests and costs as fixed by this Court under 35 U.S.C. § 284.

64. Defendants' infringement of the '170 Patent, at least as of the date of the Complaint, is willful, intentional, deliberate, and/or in conscious disregard of IPM's rights under the '170 Patent.

65. The patent-marking provisions of 35 U.S.C. § 287(a) do not limit IPM's recovery for the infringement alleged in this Count either because either are not applicable or, in the alternative, because IPM has complied with the marking statute.

## COUNT III
## (Infringement of the '913 Patent)

66. IPM incorporates by reference each allegation in the Paragraphs above as if fully set forth herein.

67. The '913 Patent, entitled "Method and System for Emulating Inverse Kinematics," duly and legally issued on May 17, 2016, from U.S. Patent Application No. 13/770,900, filed

February 19, 2013. The ’913 Patent names Chun Yue Gordon Wong, Graham Thurstan Smith, and Keith William Reid as inventors. The USPTO issued a Certificate of Correction concerning claims 7 and 18 of the ’913 Patent on August 2, 2016.

68. IPM owns all substantial rights, interests, and title in and to the ’913 Patent, including the sole and exclusive right to prosecute this action, enforce the ’913 Patent against infringers, and collect damages for all relevant times.

69. The ’913 Patent generally relates to methods of providing interactive computer graphics, and more specifically, to achieving inverse kinematics of three-dimensional graphics depicting how multiple parts of an object interact by using an animation of the object to constrain movement of those parts. The animation includes multiple frames arranged along a timeline having a starting time point and an ending time point.

70. Conventional inverse kinematics techniques determine how the connected parts of an object should move by formulating and processing kinematic equations. The ’913 Patent explains that processing those equations can be computationally intensive and time-consuming, particularly for an object having numerous parts that interact through complex relationships.

71. The ’913 Patent provides a technological solution that uses a pre-existing animation to constrain how the object’s parts move relative to one another. A user selects and moves one of the animated parts on a display. The system evaluates the designated movement, determines a corresponding time along with the animation timeline, selects the frame associated with that time, and displays the selected frame. The disclosed technology allows an animated part to function as a control for moving the animation forward or backward along its timeline, thereby providing interactive movement of the object’s parts without requiring the system to formulate and solve complex kinematic equations in real time.

72. The ’913 Patent is directed to patent-eligible subject matter pursuant to 35 U.S.C. § 101.

73. The ’913 Patent is valid and enforceable, and presumed as such, pursuant to 35 U.S.C. § 282.

74. Defendants have infringed and continue to infringe the ’913 Patent, including by (a) making the Accused Instrumentalities in the United States; (b) using the Accused Instrumentalities in the United States, including by demonstrating them at industry conferences such as the annual meeting of the Radiological Society of North America (“RSNA”) in Chicago, Illinois, where Siemens introduced the *syngo*.via VB20 software upgrade in 2016,[14] and by testing, installing, validating, and servicing them; (c) selling and offering to sell the Accused Instrumentalities for delivery, installation, and use in the United States, including through license and supply arrangements under which Defendants supply each version of software and updates and upgrades for U.S. customers; and (d) importing, or causing to be imported, the Accused Instrumentalities into the United States.[15]

75. Defendants have induced and continue to induce infringement of the ’913 Patent by encouraging, instructing, supporting, and assisting its affiliates, customers, and end users, with knowledge that such use infringes, to make, use, sell, offer to sell, and import the Accused Instrumentalities in the United States in a manner that directly infringes the ’913 Patent.

---

[14] *See* Siemens Healthineers, Background Information: How Cinematic Volume Rendering Technique Brings a New View to Clinical Imaging (Nov. 27, 2016), available at https://cdn0.scrvt.com/0e46935d037de4ec3888566275864b37/1800000004387540/84828dc92b67/background-cinematic-rendering-e_1800000004387540.pdf.

[15] *See* Siemens Healthcare, *RSNA 2013: New Version of syngo.via Brings Anatomical Intelligence” to Diagnostic Reading* (Nov. 26, 2013), HealthManagement.org, available at https://healthmanagement.org/c/imaging/news/new/rsna-2013-new-version-of-syngo-via-brings-anatomical-intelligence-to-diagnostic-reading.

76. Defendants have and continue to contribute to the direct infringement of the '913 Patent by its affiliates, customers, and end users when such affiliates, customers, and end users use, for example, *syngo*.via in combination with, for example, medical diagnostic equipment and other Accused Instrumentalities. Defendants do so with knowledge that, for example, *syngo*.via is especially made for use in an infringing manner.

77. The Accused Instrumentalities meet each and every requirement of at least method claim 7 of the '913 Patent.

78. For example, *syngo*.via includes Movie Panel, Nudge Contour, and cardiac 4D visualization functionality that loads pre-existing, multi-frame sequences of 3D volumes and 4D data sets that are played back "one after another, like in a flipbook," with discretely selectable, named time points within those sequences, such as graphical selection of end-diastole, end-systole, basal, and apical slices in its cardiac 4D ventricular function tool. Defendants' own documentation describes the functionality of *syngo*.via using the same terminology as the '913 Patent: an "interactive progress bar" whose "slider indicates the currently played frame," where the user can "[m]ove the slider or click a position to scroll to the desired frame quickly," and a Play/Pause control that "starts or stops the animation." *syngo*.via further allows a user to designate a position directly on the displayed image, rather than only through the separate slider: "[w]hen a movie is playing and you start scrolling with the mouse, the movie is paused and manual scrolling is activated," after which the newly selected frame is displayed. *syngo*.via also allows a user to click and drag a displayed, selected structure directly, with the system propagating the resulting change to other related displays.

79. IPM has been harmed as a result of the infringing conduct alleged above. Defendants are liable to IPM for damages adequate to compensate for Defendants' infringement,

which by law cannot be less than a reasonable royalty, together with interests and costs as fixed by this Court under 35 U.S.C. § 284.

80. Defendants' infringement of the '913 Patent, at least as of the date of the Complaint, is willful, intentional, deliberate, and/or in conscious disregard of IPM's rights under the '913 Patent.

81. The patent-marking provisions of 35 U.S.C. § 287(a) do not limit IPM's recovery for the infringement alleged in this Count either because they are not applicable or, in the alternative, because IPM has complied with the marking statute.

## JURY DEMAND

82. IPM demands a jury trial on all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, IPM requests that:

A. The Court find that Defendants have directly infringed the Patents-in-Suit and hold Defendants liable for such infringement;

B. The Court find that Defendants have indirectly infringed the Patents-in-Suit by inducing its affiliates, customers, and end users to directly infringe the Patents-in-Suit and hold Defendants liable for such infringement;

C. The Court find that Defendants have indirectly infringed the Patents-in-Suit by contributing to the direct infringement of the Patents-in-Suit by its affiliates, customers, and end users and hold Defendants liable for such infringement;

D. The Court award damages pursuant to 35 U.S.C. § 284 adequate to compensate IPM for Defendants' infringement of the Patents-in-Suit, including both pre- and post- judgment interest and costs as fixed by the Court;

E. The Court increase the damages to be awarded to IPM by three times the amount found by the jury or assessed by the Court;

F. The Court declare that this is an exceptional case entitling IPM to its reasonable attorneys' fees under 35 U.S.C. § 285;

G. The Court grant a permanent injunction against Defendants to prevent the violation of any right secured by the Patents-in-Suit, on such terms as the Court deems reasonable; and

H. The Court award such other relief as the Court may deem just and proper.

Dated: October 5, 2026

Respectfully submitted,

/s/ *Vincent J. Galluzzo by permission Andrea L. Fair*

Vincent J. Galluzzo – Lead Attorney
(Bar No. 86472FL)
Ryan P. Regan
(*pro hac vice* forthcoming)
**K&L GATES LLP**
300 South Tryon Street, Suite 1000
Charlotte, NC 28202
Tel.: (704) 331-7526
vincent.galluzzo@klgates.com
ryan.regan@klgates.com

James Shimota
(*pro hac vice* forthcoming)
Jason Engel
(*pro hac vice* forthcoming)
**K&L GATES LLP**
70 W. Madison Street, Suite 3300
Chicago, IL 60602
Tel.: (312) 372-1121
Fax: (312) 827-8000
jim.shimota@klgates.com
jason.engel@klgates.com

Of Counsel:
Andrea L. Fair

State Bar No. 24078488
andrea@millerfairhenry.com
MILLER FAIR HENRY PLLC
1507 Bill Owens Parkway
Longview, Texas 75604
Tel.: (903) 757-6400
Fax: (903) 757-2323

***Attorneys for Plaintiff Innovative Product Manufacturing, LLC***